DeF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
RICHARD RAMOS,
                     Plaintiff,

**MEMORANDUM & ORDER**

-against-

09 CV 3030

MICHAEL J. ASTRUE,
Commissioner of Social Security,
                     Defendant.
----------------------------------------------------X
DEARIE, Chief Judge.

      Plaintiff Richard Ramos brings this action pursuant to 42 U.S.C. § 405(g) for review of the final decision of the Commissioner of Social Security that he is not disabled. Both parties move pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings. For the reasons set forth below, defendant's motion for judgment on the pleadings is granted, and plaintiff's cross-motion is denied.

### Background

      Plaintiff was born in 1961 and attended three years of college and two years of law school. He worked as a New York City police officer from 1982 to January 2002. While working on the "bucket brigade" as part of the clean-up effort at the World Trade Center site, he aggravated earlier injuries he sustained over the course of his police career. Beginning in 2003, plaintiff was employed on a sporadic basis in private security as a bodyguard and driver for celebrities. He experienced problems with his walking, breathing and stability, however, and stopped working entirely after September 2007. Plaintiff posted earnings of $1,435.00 for 2006 and $2,759.00 for 2007. He supports himself, his wife and his teenage son with his pension.

      On January 10, 2008, plaintiff filed an application for disability insurance benefits as of

August 1, 2005. In the application, which is dated October 30, 2007, plaintiff listed neck, back and head conditions as limiting his ability to work. (Tr. 89.) After the Social Security Administration denied his claim by notice dated July 24, 2008, he requested a hearing. In a subsequent disability report, plaintiff listed asthma, allergies and "nervous" as additional conditions affecting his ability to work, beginning March 2008. (Tr. 99.)

He appeared with counsel at the hearing on November 19, 2008. By decision dated February 6, 2009, Administrative Law Judge Manuel Cofresi found that plaintiff was able to perform sedentary work with certain restrictions and, therefore, was not disabled. Plaintiff's insured status expired on March 31, 2009. (Tr. 15.) On May 29, 2009, the Appeals Council denied his request for review. He filed this action on July 6, 2009.

## Discussion

### I. Evidence of Disability

*A. Medical Records*

Plaintiff was evaluated on September 12, 2006 at the World Trade Center Medical Monitoring Program Clinical Center ("WTC Clinic") at the Mount Sinai School of Medicine. He complained of frequent headaches, facial pain and pressure, sinus congestion, eye irritation, nasal and throat symptoms, dizziness, reflux, skin irritation, dry cough, wheezing, chest tightness, airway sensitivity to airborne irritants and cold air, waking due to shortness of breath and shortness of breath on exertion, all of which began or worsened after the September 11 attacks. In addition, he reported neck and low back pain, secondary to a job related injury in the 1990s and re-injury while working at the World Trade Center site. (Tr. 145.) Upon physical

examination, he "showed pain with motion of [his] neck, shoulders, and lower back." (Tr. 146.) An MRI of the brain, performed on October 13, 2006, revealed no abnormalities, but showed a "mild spondylitic change related to the C3-4 disc." (Tr. 156.)

On November 3, 2006, plaintiff's pulmonary function was evaluated. The report indicated "severe obstruction with significant response to bronchodilator" but noted that "air trapping or poor effort" could account for the results as an alternative to muscle weakness. (Tr. 263.) A pulmonary function test on April 25, 2008, revealed "no obstruction" and only "mild restriction with significant response to bronchodilator." (Tr. 261.)

On February 13, 2007, plaintiff saw Dr. S. Fineman, a neurologist at the Queens-Long Island Medical Group, for persistent dizziness and a facial twitch. He reported that he had a fear of fainting and had given up a couple of jobs as an independent contractor in security. Upon examination, plaintiff was able to "jog in place easily with his eyes closed while making rapid alternating movements." (Tr. 120.) Dr. Fineman's impression was that plaintiff had a high degree of anxiety, nonspecific dizziness and cervicalgia (non-radiating neck pain). He noted that he and plaintiff had a "lengthy conversation with lot of hopeless ideation," and that he reassured plaintiff that "a feeling of lightheadedness does not correspond to an illness necessarily." (Tr. 120.) Dr. Fineman noted that "[o]rthostatic testing or tilt table testing could considerably be somewhat revelatory, but I really do not think it will lead to anything other than encouragement." (Tr. 120.) He referred plaintiff for a cervical spine MRI. (Tr. 120.)

On March 23, 2007, plaintiff saw Dr. Paul Lerner, Assistant Clinical Professor of Neurology at the Albert Einstein College of Medicine of Yeshiva University, for an evaluation of his complaints of feeling unsteady and several syncopal (fainting) and near syncopal episodes,

primarily after exercising. (Tr. 181.) Plaintiff reported "difficulty driving and found himself swerving for no apparent reason." (Tr. 181.) Upon examination, "[a]ctive range of motion at the neck was observed to reveal a moderate degree of restriction in all directions associated with discomfort." Dr. Lerner's impression was that plaintiff suffered from chronic cervical and lumbar strain with disc bulging and degenerative changes, recurrent syncope, and unsteadiness likely related to syncope and near syncope. (Tr. 182.) He recommended additional testing—an EEG, Brain Stem Evoked Response testing, and a Carotid Ultrasound—noting that his neck and back "should benefit from a course of physical therapy and additional treatment including epidural injection, etc. should depend upon his clinical course and the results of the [additional testing]." (Tr. 183.) On June 22, 2007, Dr. Lerner saw plaintiff for a follow-up visit. Plaintiff had no new complaints and had not experienced additional syncopal episodes. (Tr. 191.) The results of the additional recommended testing were "unremarkable." (Tr. 191.) Dr. Lerner's impressions were cervical thoracolmbar strain and history of syncope and unsteadiness. He recommended completion of cardiac testing and noted that "[p]hysical therapy of the neck and back may be of value." (Tr. 191.)

On April 12, 2007, plaintiff was seen again at the WTC Clinic. Plaintiff denied having anxiety or depressive symptoms, but reported flashbacks. (Tr. 240) "[Q]uestionable PTSD" (Post Traumatic Stress Disorder) was noted, and plaintiff was referred for a mental health evaluation. (Tr. 240, 250.) Plaintiff declined the evaluation, however, because he did not want to lose his firearm license. (Tr. 250.) Notes from the WTC Clinic dated June 21, 2007, indicate that plaintiff was using a Transcutaneous Electrical Nerve Stimulation ("TENS") machine with good effect for pain. (Tr. 258.)

On November 9, 2007, plaintiff was evaluated by Dr. Daniel Mayer at Mt. Sinai for complaints of insomnia. Dr. Mayer's impression was that plaintiff had psychophysiological insomnia. He prescribed Ambien and referred plaintiff for cognitive behavior therapy, "the optimum treatment for insomnia." (Tr. 298.) Plaintiff returned to Dr. Mayer on March 27, 2008. (Tr. 295.) He reported improved sleep quality while taking Ambien two to three times a week and had no problems with unintentional dozing. (Tr. 295.) Plaintiff also reported that he was seeing a psychologist for depression and psychological issues relating to the World Trade Center disaster. (Tr. 295.) He was advised to consider cognitive behavior therapy if his insomnia worsened. (Tr. 296.) Progress notes from the WTC Clinic dated April 3, 2008, again indicate questionable PTSD and depression and that plaintiff declined cognitive behavioral therapy in 2007 to address his sleep problems. (Tr. 234-36.)

On April 25, 2008, plaintiff saw Dr. Parag Sheth through the WTC Clinic for an evaluation of his neck pain. Dr. Sheth's follow-up note indicates that he had last seen plaintiff on February 5, 2008, and that plaintiff had an MRI of the cervical spine on February 9, 2008. Although the MRI study itself is not included in the record, Dr. Sheth noted that it "shows no evidence of significant disc herniation, but there is disc bulges noted at C5-C6 and C6-C7 and minimal retrolistheses of C3-C4." (Tr. 218.) Plaintiff reported continued "deep and achy" neck pain that he rated as a five in severity on a scale up to ten. (Tr. 218.) The pain worsened with movement and improved with rest. (Tr. 218.) Plaintiff also reported dizziness and said that he had begun counseling for possible PTSD. (Tr. 218.)

Upon physical examination by Dr. Sheth, plaintiff exhibited a full range of motion of the cervical spine. (Tr. 219.) He was negative in response to the Spurling's test, a physical

5

manipulation of the neck and head that is considered positive if radiating pain results, indicating that plaintiff had no cervical nerve impingement. (Tr. 219.) However, palpation reproduced neck pain, headache complaints and tenderness over the mid cervical paraspinal musculature. Dr. Sheth's impression was that plaintiff suffered from chronic axial cervical pain, and he noted that plaintiff's history and exam suggested cervical facet syndrome. Dr. Sheth recommended that he continue taking 100 m.g. Ultram E.R. and scheduled branch blocks at the C4, C5 and C6 levels for May 19, 2008. Notes dated June 2, 2008, from the World Trade Center Clinic indicate that a few days after the branch blocks, plaintiff was in more pain. (Tr. 233.) Plaintiff reported that he went to the North Shore Hospital emergency room because he felt flushed and dizzy, had numbness in his jaw and "feedback" in his left ear, but he did not stay because it was too busy. (Tr. 233.) He admitted that he moved his neck "a great deal after the injections and thinks that may have caused some of the pain." (Tr. 233.) Plaintiff presented a prescription from Dr. Sheth's office for Valium 5 m.g. TIG for muscle spasms. (Tr. 233.)

On May 30, 2008, plaintiff was seen by consultative examiner Dr. Luke Han. He reported constant neck pain radiating to his right shoulder and fingers and back pain radiating usually to his right leg but sometimes to his left. (Tr. 186.) He rated the pain a five or six that could become a ten, on a zero to ten scale. (Tr. 186.) In addition, plaintiff reported that he had insomnia, does not drive, cannot bend or lift heavy things, and suffers from dizziness. (Tr. 187.) He said that he cannot cook because he forgets that the stove is on, and he cannot clean, do laundry or shop. (Tr. 187.) Plaintiff also said, however, that he can shower and dress by himself every day. (Tr. 187.)

Upon examination, Dr. Han observed that plaintiff was unable to move his neck

("cervical spine shows forward flexion 0 degree, extension 0 degrees, lateral flexion 0 degrees, and rotary movement 0 degrees"). (Tr. 189.) His lumbar spine showed forward flexion 30 degrees, extension 10 degrees, lateral flexion 20 degrees, and rotary movement 30 degrees bilaterally. He noted tenderness at the paraspinal muscles in the cervical and the lumbar area bilaterally. (Tr. 189.) Dr. Han's diagnoses included "[d]egenerative disc disease, cervical and lumbar vertebrae," "pain, neck and lower back," dizziness and insomnia. (Tr. 190.) He concluded that "plaintiff has mild to moderate restriction for heavy lifting and carrying" and "should avoid driving or operating machinery." (Tr. 190.)

Notes from the WTC Clinic on July 17, 2008, indicate that plaintiff had not seen a mental health provider in the past couple of months because he thought it was not helpful. (Tr. 231.) They also indicate that plaintiff was sleeping better with Ambien. Progress notes on the same date by Dr. Ekong Ekong indicate questionable PTSD and depression for which plaintiff declined treatment on the ground that he did not feel that he needed it. (Tr. 232.)

Plaintiff was re-evaluated by Dr. Sheth on August 29, 2008, for his neck pain. He reported to Dr. Sheth that he tried to move his neck a lot after the branch block and thought that the increased activity resulted in the pain relief lasting only three hours. (Tr. 291.) He rated his pain as severe and interfering with his daily activities because of his limited range of motion in his neck. (Tr. 291.) Two tablets of Ultram 100 m.g. ER a day helped the pain. (Tr. 291.) Plaintiff also reported that the pain was exacerbated by any kind of neck movement and occasionally radiated down to his shoulders. He continued to report dizziness, but no pain in his arms, low back or legs. According to plaintiff, an EMG test that had been done a year earlier by his neurologist did not reveal any nerve abnormality. (Tr. 291.) Upon physical examination, Dr.

Sheth noted that plaintiff was "anxious about his neck pain . . . appropriate to his condition." (Tr. 291.)

Plaintiff's cervical range of motion was limited in all directions secondary to pain, his Spurling's test was positive bilaterally, and palpation of his paraspinal muscles produced mild tenderness. (Tr. 291.) Dr. Sheth increased his dose of Ultram to 200 m.g. daily and scheduled a follow-up appointment in three months. (Tr. 292.) Plaintiff was instructed to bring the EMG report. (Tr. 292.)

On August 29, 2008, Dr. Sheth completed a New York State Workers' Compensation Board form indicating that, based on an examination that day, plaintiff was partially disabled due to his cervical diagnoses and could not perform his prior work. (Tr. 302). He completed the form three prior times, each time indicating that plaintiff was partially disabled with the same diagnoses based on examinations on August 14, 2007, February 5, 2008 and April 25, 2008. (Tr. 303-05.) By letter dated October 24, 2008, hearing counsel for plaintiff forwarded a Social Securities Administration Physical Capabilities Evaluation form to the WTC Clinic. (Tr. 282.) No form, however, is included in the record. Disability examiner S. Duffy-Lawrence reviewed plaintiff's file on July 23, 2008, and completed a Physical Residual Functional Capacity Assessment form in which he concluded that plaintiff could not perform his past work but had the ability to perform light work. (Tr. 192-97.) Plaintiff's claim was first denied based on this assessment. (Tr. 31.)

*B. Hearing Testimony*

Dr. Michael Falcove testified as a medical expert at plaintiff's hearing. (Tr. 341-51.) He opined that a person with plaintiff's impairments could "carry some light weight for short

distances" but would not be able to do heavy or medium work and would have a number of environmental limitations including "hot, cold, dust, fumes, odors, that type of stuff." (Tr. 350.) With the same neck problems, a person would be able to sit at a desk "for a half hour to an hour at a clip, get up, move around a little bit, and then . . . come back down. But . . . consecutive sitting at a desk . . . might be an issue for him." (Tr. 350.) He further stated, "quite honestly, the biggest issue[] is the psychological insomnia. Because if he's going for . . . days sometimes without sleeping, that has to impair his ability . . . to be able to concentrate at work." (Tr. 350-51.) With respect to continuous sitting, Dr. Falcove elaborated that getting up for a significant period of time would not be necessary, but that walking around for a couple of minutes would be sufficient. (Tr. 351.) Noting that there was "very little in the medical record to indicate anything with the low back at all," he further concluded that there were no issues with walking or standing. (Tr. 351.)

Plaintiff testified that his worst problem was his neck, and that after the branch block, it had become much worse. (Tr. 328.) He said that Dr. Sheth had told him "to try to do some activities," but that he ended up in the emergency room because of radiating pain, weakness in his legs, and loss of motor function. (Tr. 328-29.) He complained of back problems upon bending over, chest pains, inability to take a full breath, chronic sinus infections and insomnia. (Tr. 329-31.) He said that he could not sleep because of his neck pain and claimed that Ambien sometimes did not help. (Tr. 331.) Plaintiff said that he could stand for one-half hour before getting pain in his back and sit for one-half hour to an hour at a time before needing to get up. (Tr. 333-34.) He felt dizzy when traveling in cars, trains and buses, and could not remember the last time he drove. He also said that he could walk only a block without feeling dizzy and short

of breath, and that he sometimes experienced "a sudden loss of power in a hand or leg." (Tr. 334-35.) He could, however, sometimes lift ten or fifteen pounds. (Tr. 335.) On a typical day, plaintiff would get up, take his medications, and sit in a hot bath for an hour or two to relieve muscle pain and stiffness. (Tr. 338.) His wife would draw the bath and help him get in and out. (Tr. 338.) For the remainder of the day, plaintiff would listen to the radio, "try to take" his medication, "try to call friends," and take a walk "if I can." (Tr. 339.) He was wearing a 5% Lidocaine patch prescribed by Dr. Sheth on the back of his neck at the hearing. (Tr. 340.)

Plaintiff also claimed to have short-term memory problems that he thought were related to PTSD. (Tr. 337.) He said that he had been diagnosed with PTSD by a mental health provider named Annie Jarowski at the WTC Clinic, for which therapy had been recommended two to three times a week. (Tr. 337.) He testified that he could not comply, however, because his wife was unable to drive him into Manhattan that often, especially given the number of times he was already going in to see medical doctors. (Tr. 337-38.)

## II. Standard of Review

Under 42 U.S.C. § 405(g), this Court "may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (quoting Shaw v.Chater, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

A claimant is "disabled" within the meaning of the Social Security Act only if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Social Security Administration has established a sequential five-step process for making this determination. See 20 C.F.R. § 404.1520. The Commissioner must first analyze whether the claimant is engaged in substantial gainful activity. If not, the Commissioner then evaluates whether the claimant has a medically determinable impairment or combination of impairments that is "severe." Upon finding a "severe" impairment at step two, the Commissioner determines whether the impairment is "listed" in the regulations requiring a determination of disability at step three. At step four, the Commissioner analyses whether the claimant remains capable of performing his past work based on his residual functional capacity ("RFC"). If not, the Commissioner determines whether the claimant is capable of performing other work that exists in the national economy. Id.

When reviewing a disability determination, courts in this Circuit have long applied the standard set forth in Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000). Under Curry, at step five, the burden of persuasion shifts to the Commissioner to establish that the claimant retains the capacity to do other work. Id. Last year, however, the Court of Appeals concluded that regulations promulgated in 2003 clarified that the burden shift at step five is only a limited one, abrogating Curry. Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). In cases where the disability onset postdates the promulgation of the regulations, as in this case, the Commissioner uses "the same residual functional capacity assessment" for determining claimant's ability at step

11

five that he used at step four. 20 C.F.R. § 404.1560(c)(2); see Poupore, 566 F.3d at 306. The Commissioner is not required to provide any additional evidence of claimant's residual functional capacity ("RFC") but "need only show that there is work in the national economy that the claimant can do." Poupore, 566 F.3d at 306.

### III. ALJ's Residual Functional Capacity and Disability Determination

The ALJ concluded that "the record fail[ed] to establish that claimant is incapable of substantial gainful activity and thus disabled for purposes of the Social Security program." (Tr. 22.) He found that plaintiff had no restrictions with respect to sitting, could stand and walk for up to six hours in an eight hour day and could lift and carry up to twenty pounds occasionally. Recognizing plaintiff's non-exertional restrictions due to his difficulty breathing and history of syncope, the ALJ further concluded that plaintiff needed to avoid environments involving respiratory irritants and avoid operating automobiles and heavy machinery. (Tr. 20.) On the basis of this RFC, he determined that plaintiff could not perform his past relevant work as a police officer or security specialist but could perform a full range of sedentary work.[1] (Tr. 23.)

### IV. Review of Disability Determination

Where there is any doubt whether an ALJ has carried out his obligation to apply the correct legal principles, provide the required reasoning or adequately develop the administrative

---

[1] "Sedentary work" requires the ability to lift no more than ten pounds occasionally and the ability to sit for six hours in an eight hour work day. See Rosa v. Callahan, 168 F.3d 72, 78 n.3 (2d Cir. 1999); 20 C.F.R. § 404.1567(a). "Light work" involves lifting no more than 20 pounds, with frequent lifting or carrying of up to 10 pounds, or "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing." 20 C.F.R. § 404.1567(b).

record, this Court does not hesitate to remand a case for further proceedings or award a plaintiff other appropriate relief. In this case, however, there is no doubt; the ALJ's decision must be affirmed because it is supported by substantial evidence and based upon the correct legal standards. This Court rarely reviews medical records in this context that are as consistent as plaintiff's, and it is particularly remarkable that Dr. Han's consultative evaluation and diagnoses do not differ significantly from those of plaintiff's treating sources. While there is no disagreement that plaintiff suffers from neck pain, there is also no medical opinion or medical evidence supporting plaintiff's claim that he is disabled.

Contrary to counsel's assertions, it is clear that the ALJ thoroughly reviewed and considered all of the medical evidence and properly weighed the opinion of Dr. Sheth—the only treating doctor to submit an opinion as to plaintiff's ability to work. Dr. Sheth opined that plaintiff was partially disabled and could not perform his prior work. The ALJ accorded Dr. Sheth's opinion "significant probative value" as a treating source opinion that he found "entirely consistent with the objective medical evidence, which does establish that [plaintiff] has functional restrictions secondary to back and neck pain, as well as the need to avoid environmental irritants and the use of automobiles and heavy machinery." (Tr. 22.)

The opinion of the medical expert at the hearing and plaintiff's own admissions regarding his functional abilities also support the ALJ's determination. Plaintiff testified that he could lift ten to fifteen pounds and that he could stand for one-half hour and sit for one-half hour to an hour before needing a break. Although sedentary work requires sitting for up to six hours during an eight-hour workday, "[t]he regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-

belted passenger in the center seat on a transcontinental flight." Halloran, 362 F.3d at 33. Nothing in the record contradicts Dr. Falcove's opinion that an hourly break of a couple of minutes would be sufficient to allow plaintiff to return to sitting.

Plaintiff's counsel also suggests that the ALJ inappropriately considered plaintiff's post-onset work activity as "cast[ing] doubt on his claim to disability." (Tr. 15; Pl. Br. 3.) Once a claimant becomes entitled to disability benefits, statutes and regulations prohibit consideration of work activity during a trial period for purposes of concluding that a disability has ceased. See Stanton v. Astrue, No. 09-4088, 2010 WL 1076121, at *2 (2d Cir. Mar. 24, 2010). In deciding an initial disability claim, however, there is no such prohibition. To the extent the ALJ considered plaintiff's post-onset work activity to evaluate the "consistency and credibility" of his disability claim, there was no error. Id. Rather, the ALJ fulfilled his "duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Id. (internal quotations and citation omitted).

Despite plaintiff's solid work history as a 20-year veteran of the police force, the ALJ's finding that plaintiff's allegations concerning the "intensity, persistence and limiting effects" of his symptoms were "not entirely credible" is also supported by substantial evidence and, therefore, must be upheld. See Aponte v. Sec'y. Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (it is the ALJ's function, not the reviewing court's to appraise claimant's credibility). While "'a good work history may be deemed probative of credibility' . . . [it] is 'just one of many factors' appropriately considered in assessing credibility." Carvey v. Astrue, No. 09-4438, 2010 WL 2264932, at *3 (2d Cir. June 7, 2010) (quoting Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998)). Although the ALJ perhaps overstates the extent to which plaintiff has

14

admitted his ability to be "independent in self care and hygiene,"[2] (Tr. 22), plaintiff's claims that he is severely limited in his ability to engage in daily living activities are inconsistent with the doctors' medical findings, their reports of his abilities and appearance at his medical appointments and the ALJ's observation of him at the hearing.

In addition, the Court notes that plaintiff was able to "jog in place easily with his eyes closed while making rapid alternating movements" in February of 2007, (Tr. 120), despite alleging an inability to work beginning in August 2005. Dr. Sheth's treatment records reflect that plaintiff had a full range of motion and negative Spurling's test upon examination on April 25, 2008, and there is no other medical evidence that his cervical range of motion was significantly restricted prior to May 30, 2008, the day he was examined consultatively and for the first time exhibited no cervical range of motion whatsoever. In addition, he claims to have required urgent care after the May 19, 2008 branch block, but he was not re-examined by Dr. Sheth until August 29, 2008. On that date, plaintiff reported severe pain that interfered with his daily activities. (Tr. 291.) Plaintiff's Spurling's test was positive bilaterally, and his cervical range of motion was "limited in all directions secondary to pain." (Tr. 291.) Thus, plaintiff's subjective complaints and symptoms became significantly more pronounced toward the end of the relevant period, but there is no objective medical evidence of deterioration in his cervical condition.

Plaintiff's counsel further asserts, without any discussion, that the "ALJ blindly applied the mechanical vocational grids in light of [p]laintiff's non-exertional impairments." (Pl. Br. at 13.) The ALJ's use of the grids, however, was entirely appropriate. Reliance on the grids is not

---

[2] Dr. Han's report indicates that plaintiff said that he "showers by himself and dresses himself every day," (Tr. 187), but plaintiff claimed at the hearing that he needs help getting in and out of the bath, (Tr. 338).

15

automatically precluded by the "mere existence of a nonexertional impairment." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986). Rather, the grids may be applied when a claimant's non-exertional impairments do not "significantly diminish" work capacity by "so narrowing a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Id. at 605-6; see also Zabala v. Astrue, 595 F.3d 402, 410-411 (2d Cir. 2010) (quoting Bapp); SSR 96-9p. [3] Plaintiff's non-exertional limitations—the requirements that he avoid environments involving respiratory irritants and avoid operating automobiles or heavy machinery—do not significantly diminish his capacity to perform sedentary work. In addition, the medical evidence in the record indicates that plaintiff's insomnia, which concerned Dr. Falcove at the hearing, is well-controlled with Ambien.

Moreover, plaintiff's hearing testimony regarding his "diagnosed" PTSD and desire for treatment is flatly contradicted by the medical record. As an initial matter, whether he suffers

---

[3] SSR 96-9p: POLICY INTERPRETATION RULING TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK--IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, states:

> In general, few occupations in the unskilled sedentary occupational base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards. The "hazards" defined in the SCO are considered unusual in unskilled sedentary work. They include: moving mechanical parts of equipment, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals. Even a need to avoid all exposure to these conditions would not, by itself, result in a significant erosion of the occupational base. . . . Restrictions to avoid exposure to odors or dust must also be evaluated on an individual basis. The RFC assessment must specify which environments are restricted and state the extent of the restriction; e.g., whether only excessive or even small amounts of dust must be avoided.

from PTSD is noted to be "questionable" throughout. The record also includes entries indicating that plaintiff refused a mental health evaluation in April of 2007 because he did not want to lose his gun license and that he declined cognitive behavior therapy in November 2007 for his insomnia. Although plaintiff reported to Dr. Mayer that he was in therapy on March 27, 2008, WTC Clinic notes from July 17, 2008, indicate that he had not seen a mental health provider in the past couple of months because it was not helpful. An entry from Dr. Ekong, also on July 17, 2008, indicates that he declined treatment because he felt he did not need it.

Finally, the ALJ did not fail in his duty to develop the record. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). Although the February 9, 2008 MRI Report itself is not part of the record, the results are included in detail in Dr. Sheth's report. With respect to plaintiff's mental health, given the conflicting scattered references in the record as to whether plaintiff actually sought or received any treatment for his questionable PTSD and depression, and the absence of such records in the materials received from the WTC Clinic, the ALJ fairly concluded that there was "no evidence of any treatment for this or any other mental impairment." (Tr. 20.)

## Conclusion

The determination that plaintiff is not disabled is based on substantial evidence, the correct legal standards, and an adequately developed record. The ALJ properly weighed the treating physician's opinion as well as the opinions of the consultative examiner and the medical expert that appeared at the hearing, all of which were essentially consistent. In addition,

substantial evidence supports the ALJ's determination with respect to plaintiff's credibility. Accordingly, the Commissioner's motion for judgment on the pleadings is granted and plaintiff's cross-motion is denied. Plaintiff's complaint is dismissed. The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
August /9, 2010

s/ Judge Raymond J. Dearie

---
RAYMOND J. DEARIE
United States District Judge